STATE of Wisconsin, Plaintiff-Respondent,†

v.

Evan ZIMMERMAN, Defendant-Appellant.

Court of Appeals

*No. 02–3097–CR. Submitted on briefs June 24, 2003.—Decided August 12, 2003.*

2003 WI App 196

(Also reported in 669 N.W.2d 762.)

† Petition to review denied 1-23-04.

1004

1007

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Keith Findley* of *Wisconsin Innocence Project*, University of Wisconsin Law School.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Edwin J. Hughes*, assistant attorney general.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J.   Evan Zimmerman appeals a judgment entered on a jury verdict convicting him of first-degree intentional homicide and an order denying his motion for postconviction relief. Zimmerman raises several issues on appeal.[1] He argues: (1) The evidence was insufficient to convict him; (2) the trial court erroneously allowed the State to rely on speculative evidence connecting him with the victim on the night of

---

[1] We wish to acknowledge the following law students who as participants in Wisconsin Innocence Project made a significant contribution to the appellant's appeal:   Neil F. Byl, Mary Delaney, Megan Morrisey and Sheila Sullivan.

the murder; (3) the State knowingly presented false evidence; (4) his trial counsel was ineffective; (5) he is entitled to a new trial because of newly discovered evidence; and (6) he is entitled to a new trial in the interest of justice.

¶ 2. We conclude that Zimmerman's trial counsel was ineffective because he (1) failed to introduce DNA test results that excluded Zimmerman; (2) failed to obtain and present independent medical testimony regarding the victim's death; and (3) failed to obtain and present expert testimony challenging the hypnotically refreshed testimony of the crime's only witness. As a result of this conclusion, we must determine if the trial evidence was sufficient to convict to determine whether remand for a new trial is required. We conclude the evidence was sufficient to sustain the jury's verdict and therefore remand for a new trial.

## BACKGROUND

¶ 3. On February 26, 2000, at about 5:45 a.m., Kathy Thompson's strangled body was found on a curb on Laurel Street in Eau Claire. Thompson had last been seen walking home from jail around 3 a.m. She and her husband, Robert Miles, had both been taken to jail as a result of a domestic dispute, although Miles was kept overnight on a probation hold. They had been married the day before, and had been seen fighting at their wedding reception. When leaving the jail, Thompson refused a police officer's offer of a ride, saying she wanted to walk home. She began walking in the direction of her apartment, which was a few blocks away and close to the apartment of an ex-boyfriend, Zimmerman.

¶ 4. After the body was discovered, Zimmerman immediately became the focus of the murder investigation. Zimmerman and Thompson had dated from No-

vember 1998 until May 1999. Evidence at trial suggested that it had been an uneven relationship that Zimmerman took much more seriously than Thompson. Zimmerman, for instance, had referred to Thompson as his future wife, and after their breakup, he would often show up at taverns and other places where Thompson was. During and after their relationship, Thompson often requested favors of Zimmerman, including loans and frequent use of his van, and she also relied on him for emotional support.

¶ 5. After a year-long investigation, Zimmerman was charged with Thompson's murder. At trial, the State's theory of the crime was that Thompson had met up with Zimmerman after leaving jail, probably at his apartment. The State argued that Thompson's marriage and her rejection of Zimmerman had angered him and led him to kill her. Finally, the State claimed Zimmerman transported Thompson's body to Laurel Street upright in the passenger seat of his van.

¶ 6. The trial evidence was almost entirely circumstantial. The State's case was based on: (1) Zimmerman's inconsistent alibis, incriminating statements to police, and suspicious behavior and statements to others on the morning Thompson's body was discovered; (2) the opportunity he had to kill her; (3) evidence that Zimmerman was obsessed with Thompson; (4) medical testimony regarding the cause of Thompson's death and the circumstances surrounding it; and (5) the hypnotically refreshed testimony of Brice Rene, who said he saw a van similar to Zimmerman's with a woman in the passenger seat near the site and close to the time Thompson's body was discovered.

¶ 7. The police first contacted Zimmerman the day of the murder. The State and Zimmerman dispute his activities that day. Zimmerman claims he woke up at

1011

9:30 a.m. and went to buy cigarettes at a gas station. On his way there his neighbor, Michael McDonald, told him the police had been looking at his van; Zimmerman expressed concern that they might have looked inside because he had left empty beer cans in the vehicle. After arriving at the gas station, another patron told Zimmerman that he heard a woman had been murdered and "gutted up" on Margaret Street. Zimmerman testified he went home and was eventually contacted by detective William Slaggie, who asked if he knew Thompson and was aware that she was dead. Zimmerman then went to the VFW bar.

¶ 8. The State claimed that Zimmerman was out of the house much earlier that day. Another neighbor of Zimmerman's, Todd Loew, testified that he saw Zimmerman get out of his van between eight or nine o'clock that morning, and that he did not think the van had been there a half-hour to forty-five minutes earlier. When police arrived at Zimmerman's residence around 9:30 or 10 a.m., however, they found no one home. After looking around Zimmerman's van, the police said they left. McDonald testified he saw Zimmerman walking his dog between 10 and 11 a.m., and then told Zimmerman about the police looking at Zimmerman's van. After about a half-hour, McDonald said Zimmerman left in the van. The police contacted Zimmerman at the VFW bar that afternoon, and told a very intoxicated Zimmerman that Thompson was dead. Detective James Southworth said that Zimmerman appeared to be upset and surprised by the news, and did not say he already knew about the murder.

¶ 9. Ron Gibson, a friend of Zimmerman's, testified that at the VFW on the afternoon after the murder, Zimmerman told him that Thompson had been murdered and, "That they found her up on Margaret Street,

gutted like a fish." Another friend, Maureen Horne, said Zimmerman told her that afternoon that Thompson "had been murdered and that she was disemboweled and strangled," and that the body had been found on Margaret Street.[2] The officers who contacted Zimmerman at the VFW that afternoon testified they did not tell him how Thompson had been murdered. At trial, Zimmerman argued that he knew the location and the cause of death, both of which turned out to be at least partially wrong, because he had heard them at the gas station that morning. The State, however, claimed that Zimmerman knew these things because he was responsible for the murder.

¶ 10.   Detective Donn Adams testified that he contacted Zimmerman later on the day of the murder and that Zimmerman claimed to have been drinking with his neighbor, Lowell Brown, on that morning. Brown testified that this was not true, and Zimmerman disputed Adams's testimony, claiming only to have called out to Brown after arriving back from the VFW on the morning of the murder. Zimmerman allowed Adams to look though his apartment and impound his van for examination.

¶ 11.   On February 27, Zimmerman had a telephone conversation with a co-worker, Shane Eckwright, about the murder. Zimmerman told Eckwright that he had been at the VFW on the night of the murder with Dan Cox and Gibson until about 2:30 a.m. Both Cox and Gibson corroborated this story. On February 28, Diane Steinke, a friend of Zimmerman's, called Slaggie and told him that Zimmerman had slept at her house after returning from the VFW on the morning of the murder.

---

[2] Margaret Street is approximately one-half-block from where Thompson's body was found.

Brown also told police that Zimmerman said he had spent the night at Steinke's.

¶ 12. At trial, Zimmerman testified that on the night of the murder, he left the VFW at 2:30 a.m., had a drink with Cox in the parking lot, and then drove to his friend James Stephanic's house. Not seeing Stephanic's car, he left and went to Steinke's. Although her lights were on, he said he got no response knocking on her door and went home. There, he called up to Brown to see if he wanted to have a beer, but Brown did not respond so Zimmerman went to sleep.

¶ 13. In April 2000, the police conducted a traffic survey in the area where Thompson's body was found, asking motorists if they had been in the area on the morning of February 26. A man named Brice Rene said he had been in the area and had noticed a white van with a sleeping or passed out female passenger around 5:30 a.m. while he was on his way to work. The police showed Rene pictures of Zimmerman's van, a white Dodge with wood paneling, and he said he thought it was the one he saw, but was unsure. He could not identify the driver and did not describe the woman passenger. Rene said he saw the van at an intersection where it had to wait for his car to pass, and it then turned behind him.

¶ 14. In an effort to recover information, the police had Rene hypnotized. During the hypnosis session, which was videotaped and replayed at trial, Rene recalled that the van turned in front of him, not behind, that the woman had a medium build, was in her late thirties and had shoulder-length brunette hair, and that the van may have been a Ford with a blue racing stripe. Zimmerman's counsel unsuccessfully attempted to suppress the tape as irrelevant and prejudicial.

1014

¶ 15.   The police continued to contact Zimmerman to discuss the case. In August 2000, they informed him that a witness had seen a woman with her eyes closed in a white van near the area where Thompson was found. At trial, the officer who conducted the interview said Zimmerman's response was "nobody saw us," although on cross-examination he agreed that Zimmerman had said "nobody saw us because we weren't together," but explained that there was a pause between "us" and "because." The officer also testified that in the same conversation, Zimmerman became very emotional and began crying after he said he thought his daughter would forgive him if he was responsible for the crime. After his arrest, Zimmerman told the arresting officer he really could not remember what had happened the night of the murder, but that he was "going to stick with" his claim that he went home and went to bed. When the officer asked if Zimmerman might have committed the murder while he was blacked out, Zimmerman told him it was a possibility.

¶ 16.   In support of its claim that Zimmerman was obsessed with Thompson, the State presented evidence that after their breakup, Zimmerman would appear at taverns and other places where Thompson was, and once even appeared in her kitchen in the middle of the night. A friend of Thompson's testified that Thompson had told her that Zimmerman had said if he could not have Thompson, no one could. In addition, a friend of Zimmerman's said that Zimmerman had told him that "he would like to kill [Thompson] and . . . cut her cunt out so he could take it out and take it home and fuck it whenever he wanted to." The State also introduced Zimmerman's diary entries regarding his and Thompson's relationship, which detailed, among other things, when they had sex and Thompson's "periods."

1015

¶ 17.   The defense presented evidence suggesting that Zimmerman was "over" Thompson. For instance, the man whom Thompson dated after Zimmerman, but before her husband, testified that Zimmerman was not angry when he learned of the relationship and told him to treat Thompson well. In addition, the defense introduced a note and the testimony of two witnesses showing that Zimmerman had wished Thompson well after learning she was getting married.

¶ 18.   At trial, the State's theory of opportunity was that because Thompson still turned to Zimmerman for help, she likely went to him after her release from jail. In support, the State pointed out that she had tried to persuade two friends to take her to Zimmerman's after leaving her wedding reception. In addition, the State noted that she walked towards Zimmerman's apartment after leaving the jail, although her apartment was also in that direction. Because Zimmerman would have recently arrived home from the VFW, the State argued, he would still be awake when she arrived.

¶ 19.   Ramsey County, Minnesota, medical examiner Michael McGee performed Thompson's autopsy. He testified the cause of her death was asphyxia due to ligature strangulation, and that a telephone cord found in Zimmerman's van may have been the object used. McGee also said that Thompson's nasal secretions had dried in such a way on her face to suggest she had been sitting upright, rather than lying down, when the secretions drained and dried, and that this would have been consistent with her sitting in the passenger seat of Zimmerman's van. He also said it was possible that she was strangled inside the van. McGee testified he did not think the murder was sex-related.

¶ 20.   The State also presented physical evidence seized from Zimmerman's van and from the area where

Thompson was found. Police found Thompson's hair, identified by DNA testing, on a brush in the van. The police also collected cigarette butts from the area where Thompson was found, hairs from Thompson's pants and sweater, and scrapings from her fingernails. The test results excluded Zimmerman as a source, and Zimmerman, Thompson and her husband were excluded as sources of the DNA on the cigarette butts and hair found on Thompson's pants. Police also had beer cans from Zimmerman's van tested, which returned only his DNA. Zimmerman's attorney did not elicit testimony that the DNA samples taken from the scene excluded Zimmerman and that some samples excluded Zimmerman, Thompson, and her husband.

¶ 21.   In addition, Zimmerman owned a dog, and the police recovered a substantial amount of dog hair from his van. No dog hairs were found on Thompson. Thompson owned a cat and her sweater was covered in cat hair, but no cat hairs were found inside the van. The telephone cord did not contain any DNA. Carpet fibers from Thompson's shoes could not be matched to any source.

¶ 22.   The jury convicted Zimmerman of first-degree intentional homicide and the court gave him the mandatory life sentence, making him eligible for extended supervision in twenty years. In his motion for postconviction relief, Zimmerman claimed that his counsel was ineffective, that the State knowingly introduced false testimony, and that he was entitled to a new trial based on newly discovered evidence. The court rejected all these claims, and he now appeals.

#### DISCUSSION

¶ 23.   As noted, Zimmerman raises several issues on appeal. Because we conclude that his trial counsel

was ineffective, however, we need not address most of these claims. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issue need be addressed). We are required, however, to determine whether the evidence was sufficient for the jury to convict Zimmerman because, if it was not, we would be precluded from remanding for a new trial by the double jeopardy clauses of the Wisconsin and United States Constitutions. *See State v. Perkins*, 2001 WI 46, ¶ 47, 243 Wis. 2d 141, 626 N.W.2d 762.

¶ 24.   We are satisfied that the evidence introduced at trial is sufficient to sustain the jury's verdict. When reviewing the sufficiency of the evidence, "The test is not whether this court or any of the members thereof are convinced [of the defendant's guilt] beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true." *State v. Poellinger*, 153 Wis. 2d 493, 503–04, 451 N.W.2d 752 (1990).

> [I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.

*Id.* at 507 (citation omitted).

¶ 25. Zimmerman contends, and the State admits, that most of the persuasive evidence against him was his own statements and alibis. The problem with this, Zimmerman argues, is that they are so lacking in probative value that they are insufficient to support the jury's verdict. We are not persuaded, however, that the only substantial evidence of Zimmerman's guilt were his statements and alibis. Instead, we must examine all the evidence introduced at trial and, if any reasonable inferences from it could support the verdict, we must accept those inferences.

¶ 26. It is true that the inferences from Zimmerman's statements are mostly negative. In his brief, Zimmerman argues that the various alibis he gave to the police regarding his whereabouts on the night of the murder can be construed as consistent. We agree, however, it is just as easy, if not easier, to construe them as inconsistent. Zimmerman told the police various things regarding his whereabouts on the morning of the murder. Simply because his testimony at trial reconciled some of the inconsistencies does not mean the jury was required to accept that explanation.

¶ 27. Zimmerman also argues that even if the jury had concluded he fabricated his alibi, this alone is not enough to support the verdict. *See Stewart v. State*, 83 Wis. 2d 185, 193, 265 N.W.2d 489 (1978) (a negative inference from defendant's testimony, standing alone, is insufficient to sustain a guilty verdict). This argument, however, ignores the rest of the evidence presented at trial that allowed the jury to reach its verdict.

¶ 28. For example, the testimony establishing Zimmerman's obsession with Thompson and his statements about her could also help lead a jury to conclude that he was responsible for killing her by establishing

his motive. Zimmerman argues that the evidence suggested he was "over" Thompson by the time of her wedding and had, in fact, wished her good luck in her life. However, there was also evidence of his obsessive behavior, such as his diary and his appearance at bars and other places where Thompson was present after their breakup. While there may be innocent explanations for these behaviors, there certainly are negative implications that could be reached as well, and the jury could reasonably conclude that Zimmerman was obsessed with Thompson, and this was a motive for him to kill her.

¶ 29.    The jury could also have inferred guilt from the testimony about Zimmerman's knowledge of the location of Thompson's body and her cause of death. Although he named the wrong street and said incorrectly that she had been gutted, the street was very close to where the body was found and he correctly said that Thompson had been strangled. A jury could reasonably infer that the reason he knew these things was because he was responsible for the murder.

¶ 30.    In addition, while it was minimal, the direct and physical evidence was not without probative value. One of Thompson's hairs was found in a brush in Zimmerman's van. A reasonable inference is that the hair came from Thompson on the night of the murder, that Thompson was killed or transported in Zimmerman's van, and that he killed her. We agree that the remaining DNA evidence is overwhelmingly against the State's case. However, we must indulge every reasonable inference and it is for the jury to determine the credibility of witnesses, the weight to be given to the evidence, and to resolve conflicts in testimony. *See Poellinger*, 153 Wis. 2d at 506.

¶ 31. Finally, a jury could infer Zimmerman's guilt from Rene's testimony that he saw a white van in the area around the same time that Thompson's body was found. Despite conflicts in Rene's testimony and his inaccurate description of the van, he said he saw a white van, close in time and proximity to the discovery, and that a woman similar to Thompson was passed out or sleeping in the passenger seat. A jury could infer that the van was Zimmerman's, Thompson was the woman, and that, instead of her being passed out or sleeping, she was dead. Based on Rene's testimony, Zimmerman's inconsistent alibis, the physical evidence and the evidence of Zimmerman's obsession with Thompson, a reasonable jury could conclude beyond a reasonable doubt that he was guilty.

¶ 32. We next address Zimmerman's claim that his trial counsel was ineffective. Zimmerman claims his counsel was ineffective because he failed to (1) expose the State's false claims of Zimmerman's guilty knowledge of the murder's details by not introducing evidence that the police had released information about the murder before Zimmerman demonstrated his knowledge; (2) present the DNA test results that excluded Zimmerman and presented the profile of an unknown man; (3) obtain and present medical testimony challenging Dr. McGee's conclusions; (4) challenge Rene's hypnotically refreshed testimony; (5) object to inadmissible hearsay and opinion testimony; and (6) object to improper closing arguments.

¶ 33. In order to prevail on an ineffective assistance of counsel claim, a defendant bears the burden of establishing that counsel's performance was deficient and that the deficient performance produced prejudice. *State v. Sanchez*, 201 Wis. 2d 219, 232–36, 548 N.W.2d

69 (1996). To prove deficient performance, a defendant must establish that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant must overcome a strong presumption that his or her counsel acted reasonably within professional norms. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990).

¶ 34.    To show prejudice, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a defendant alleges multiple deficiencies by trial counsel, prejudice should be assessed based on the cumulative effect of these deficiencies. *State v. Thiel*, 2003 WI 111, ¶ 59.

¶ 35.    Ineffective assistance of counsel claims present mixed questions of law and fact. *State v. Pitsch*, 124 Wis. 2d 628, 633–34, 369 N.W.2d 711 (1985). A trial court's factual findings must be upheld unless they are clearly erroneous. *State v. Harvey*, 139 Wis. 2d 353, 376, 407 N.W.2d 235 (1987). Whether counsel's performance was deficient and, if so, whether the deficient performance prejudiced the defendant present questions of law, which we review de novo. *Pitsch*, 124 Wis. 2d at 634. The defendant has the burden of persuasion on both prongs of the test. *Strickland*, 466 U.S. at 687, 697.

¶ 36.    We conclude that Zimmerman's trial counsel was deficient due to his failures to present the DNA evidence that excluded Zimmerman, offer alternative

medical testimony, and challenge Rene's hypnotically refreshed testimony. Further, we determine that the cumulative effect of these errors was prejudicial and, therefore, Zimmerman is entitled to a new trial because he received ineffective assistance of trial counsel.

¶ 37.   We first examine Zimmerman's claim that his counsel was ineffective by failing to present the DNA evidence. The State submitted numerous items for DNA testing, including cigarette butts found near Thompson, hairs found on her pants and sweater, and tissue samples taken from under her fingernails. DNA extracted from these sources was compared against profiles of Zimmerman, Thompson, and Miles. Zimmerman was excluded as the source of any of these items, and all three were excluded as the source of the hairs taken from the pants and the cigarette butts.

¶ 38.   At trial, the DNA results came in through lieutenant Eric Larson. Neither the State nor counsel questioned Larson about the hairs found on Thompson's pants or the fingernail scrapings and, on direct examination, Larson testified that no evidence found at the scene provided any insight into the crime. At the postconviction motion hearing, counsel testified he had no strategic reason for not introducing this evidence and admitted he made a mistake by not doing so. We agree.

¶ 39.   Counsel's failure to adequately question Larson about the DNA test results constitutes deficient performance. The situation is comparable to that in *State v. Glass*, 170 Wis. 2d 146, 488 N.W.2d 432 (Ct. App. 1992). In *Glass*, counsel for a defendant accused of sexual assault stipulated that the results of a vaginal swab taken from the victim were inconclusive. *Id.* at 149. The swabs, however, tested negative for the pres-

1023

ence of semen. *Id.* We concluded this constituted ineffective assistance because, "A 'negative' test result is far different from an 'inconclusive' one. Defense counsel's explanation for stipulating away such potentially exculpatory evidence is unsatisfactory and implausible. Whether or not the strength of that evidence later might have been diminished, Glass was entitled to have the jury hear it." *Id.* at 152.

¶ 40. Here, the only testimony regarding the DNA samples taken from the scene was that they provided no insight into the crime. At best, this statement means the samples were inconclusive. This, however, was not the case. Instead, the samples taken from Thompson's body and the surrounding area excluded Zimmerman; and one sample excluded Thompson, her husband, and Zimmerman as sources. Counsel's failure to challenge Larson's testimony with this data had the effect of essentially stipulating that the evidence was inconclusive. Instead, it was potentially exculpatory evidence that Zimmerman was entitled to have the jury hear. Counsel's failure to introduce this evidence constitutes deficient performance.

¶ 41. We next address Zimmerman's claim that his counsel should have presented alternative medical testimony to counter Dr. McGee's. At the postconviction hearing, Milwaukee County medical examiner Jeffery Jentzen testified on Zimmerman's behalf and challenged much of McGee's testimony. Specifically, Jentzen said that the telephone cord found in Zimmerman's van could not have been the murder weapon because the mark left on Thompson's neck was a wide, webbed, fabric-like pattern and contained a buckle mark, and was therefore inconsistent with the telephone cord. Further, Jentzen testified that the nasal secretion pattern was consistent with being formed while the body

was lying down, rather than sitting up, that Thompson's wounds were inconsistent with being formed in a vehicle and being strangled by someone in the driver's seat. Jentzen also stated the circumstances in which Thompson was found and some of her injuries were consistent with a sex-related crime.

¶ 42. Given the particular facts of this case, we conclude that counsel's failure to present independent medical testimony constituted deficient performance. Counsel's decision not to investigate a defense must be directly assessed for reasonableness in all the circumstances, "applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. At the *Machner* hearing,[3] counsel testified that he did not consider finding a medical examiner to review McGee's findings because they did not link Zimmerman to the crime, although he admitted Jentzen's evidence would have been helpful at trial. Many of McGee's findings were inconclusive. He testified that the telephone cord could have been the murder weapon and that nothing found in the autopsy indicated that it was not used. Jentzen, however, concluded that the cord was not used in Thompson's murder. McGee also testified that hemorrhages on Thompson's body could have been caused by being pushed against a van door or window by a person in the driver's seat, whereas Jentzen concluded this was not the case. Both of McGee's statements were important to his testimony, and both were rather inconclusive. Counsel was deficient by failing to present available alternative testimony to counter McGee.

---

[3] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶ 43. Finally, we conclude that counsel's handling of Rene's hypnotically refreshed testimony was deficient. In *State v. Armstrong*, 110 Wis. 2d 555, 329 N.W.2d 386 (1983), our supreme court first addressed the admissibility of hypnotically refreshed testimony. The trial court's discretionary decision to admit the testimony focuses on the reliability of the hypnotic session. *Id.* at 574. The court listed nine factors for trial courts to consider when deciding whether to admit hypnotically refreshed testimony. *Id.* at 571 n.23.[4]

---

[4] The *Armstrong* factors are:

1. The person administering the hypnotic session ought to be a mental health person with special training in the use of hypnosis, preferably a psychiatrist or a psychologist.

2. This specially trained person should not be informed about the case verbally. Rather, such person should receive a written memorandum outlining whatever facts are necessary to know. Care should be exercised to avoid any communication that might influence the person's opinion.

3. Said specially trained person should be an independent professional not responsible to the prosecution, investigators or the defense.

4. All contact between the specially trained person and the subject should be videotaped from beginning to end.

5. Nobody representing the police or the prosecutor or the defendant should be in the same room with the specially trained person while he is working with the subject.

6. Prior to induction a mental health professional should examine the subject to exclude the possibility that the subject is physically or mentally ill and to confirm that the subject possesses sufficient judgment, intelligence, and reason to comprehend what is happening.

7. The specially trained person should elicit a detailed description of the facts as the subject believes them to be prior to the use of hypnosis.

These factors are intended to assist the court in determining whether the hypnosis session was unduly suggestive. *Id.* The court should also examine whether the hypnosis process was reliable under the circumstances. *Id.* at 573. In addition, the supreme court held that to satisfy a defendant's confrontation right, the court must allow cross-examination of the witness, and the defendant must be allowed to introduce expert testimony on the witness' prehypnotic recollection and the effect hypnosis can have on memory. *Id.* at 569–70.

¶ 44.   Here, counsel unsuccessfully made a motion in limine to prevent Rene from testifying on the basis that the testimony would be irrelevant and prejudicial. Counsel never argued, however, that the hypnosis session did not comply with *Armstrong*'s requirements. At the postconviction hearing, counsel testified he did not challenge the testimony based on *Armstrong* because Rene's hypnotized and non-hypnotized testimony was so inconsistent that he impeached himself, and this was also why he only asked two questions while cross-examining Rene. The State suggests that this was an appropriate trial strategy and that therefore we may not second-guess counsel's choice. *See State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983).

8. The specially trained person should strive to avoid adding any new elements to the subject's description of her/his experience, including any implicit or explicit cues during the pre-session contact, the actual hypnosis and the post-session contact.

9. Consideration should be given to any other evidence tending to corroborate or challenge the information garnered during the trance or as a result of post-hypnotic suggestion.

*State v. Armstrong*, 110 Wis. 2d 555, 571, n.23, 329 N.W.2d 386 (1983) (citation omitted).

¶ 45. To begin, we are not persuaded by counsel's explanation of his trial strategy. Counsel said he let the testimony in because it was so inconsistent, yet he had tried earlier to exclude it because it was irrelevant and prejudicial. Even if it was inconsistent, counsel presumably still thought it was prejudicial. Furthermore, there was a basis to challenge the admission of the testimony under *Armstrong*. We cannot say whether the trial court would have, in its discretion, granted a motion to exclude the testimony, but counsel should have at least tried. At the postconviction hearing, Zimmerman presented the testimony of professor Alan Scheflin. He stated the hypnosis session did not comply with *Armstrong* and other standards for hypnotically refreshed testimony, such as being impermissibly suggestive, only videotaping Rene and not the hypnotist, and having the police give too much information to the hypnotist. If the trial court had agreed with Scheflin, it could have suppressed Rene's testimony.

¶ 46. If the trial court did not suppress the testimony, an expert would have been able to challenge the hypnotic session as unduly suggestive. At the postconviction motion hearing, Scheflin testified that he found numerous violations of *Armstrong*'s standards in the hypnotic session, including failure to tape both the hypnotist and Rene. Scheflin also criticized the hypnotist's oral, as opposed to written, briefing by the police and also noted police told the hypnotist that Rene "was the crucial witness, the key witness," which violated *Armstrong*'s requirement that the hypnotist be given minimal information to conduct the session. Finally, Scheflin identified several areas in which the hypnotist added content and structure to Rene's memories, including the color of the van and whether it turned in front or behind Rene. While we take no

position whether the hypnosis session violated *Armstrong*'s requirements, counsel should have at least presented available expert testimony challenging the hypnosis session and the reliability of Rene's testimony.

¶ 47.   We now address whether these deficiencies prejudiced Zimmerman's defense. As noted, to demonstrate prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Further, when multiple deficiencies are alleged, we examine their cumulative prejudicial effect. *Thiel*, 2003 WI 111, ¶ 59.

¶ 48.   Here, the cumulative effect of counsel's deficiencies is sufficient to undermine our confidence in the trial's outcome. The trial court dismissed the prejudicial effect of the claimed errors, saying the medical testimony "had nothing to offer either for or against Mr. Zimmerman's conviction," and that Rene's testimony was "much ado about nothing." The trial court also concluded that the defense proved at trial that no DNA evidence connected Zimmerman to the crime. The State makes similar arguments.

¶ 49.   We cannot agree with these statements. The evidence against Zimmerman, while sufficient to allow a jury to reach a guilty verdict, was far from overwhelming. Counsel's deficiencies relate to evidence that, if properly challenged, could have reasonably called Zimmerman's guilt into question.

¶ 50.   Zimmerman's defense was that he was not with Thompson on the night of her murder. The omitted evidence would all have reinforced this defense, and

the cumulative effect of counsel's errors is enough to undermine our confidence in the jury's verdict. The failure to introduce the exclusionary DNA evidence contributed to the prejudice because, if introduced, it might have allowed the jury to reach the conclusion that because none of Zimmerman's DNA was found at the scene or on Thompson, he was not responsible for her murder. Instead, all the jury heard was that a cigarette butt found near the body did not provide any insight into the crime. Although the jury perhaps could have reached an exculpatory conclusion without this additional DNA evidence, it would have been significantly more likely to reach this conclusion had it been informed that Zimmerman was excluded from various pieces of evidence taken from Thompson's body, rather than a cigarette butt found on a curb.

¶ 51. Similarly, by not seeking independent medical testimony, counsel allowed only the propositions that the telephone cord may have been used in the murder and that Thompson may have been injured. in the van to go to the jury. Had counsel considered seeking independent medical testimony, he could have offered the jury testimony that would have allowed them to reject any connection between McGee's conclusions and Zimmerman. Because counsel did not seek this evidence, and especially in light of the inconclusive nature of the medical testimony and the lack of other strong evidence against Zimmerman, this also contributed to the prejudice against Zimmerman.

¶ 52. Finally, we conclude that counsel's failure to challenge Rene's hypnotically refreshed testimony by attempting to keep it out under *Armstrong* or by seeking an expert to challenge the reliability of the hypnotic session also contributed to the prejudice. Rene was the only witness placing Zimmerman in the area

where Thompson's body was found. While we agree that Rene's testimony was contradictory, the potential inferences from it could very well have led the jury to its conclusion that Zimmerman was responsible for Thompson's murder. Given the "popular misconception that hypnotized people always tell the truth," *Armstrong*, 110 Wis. 2d at 573, the jury may have given undue weight to any inferences they might have drawn from Rene's testimony. Counsel did little to mitigate this concern. He also should have made a stronger attempt to prevent the introduction of Rene's testimony and, if he failed, sought an expert to challenge the hypnosis session. His failure to adequately challenge the only witness placing Zimmerman in the area where Thompson's body was found further prejudiced Zimmerman's defense.

¶ 53.    Both the State and the trial court generally dismissed Zimmerman's claims of ineffective assistance as inconsequential. Our review of the record, however, does not lead us to the same conclusion. We have determined that inferences from this evidence were necessary to sustain the jury's verdict. Thus, this evidence all contributed to Zimmerman's conviction, and defense counsel's deficient performance in these areas prejudiced Zimmerman's defense.

*By the Court.*—Judgment and order reversed and cause remanded with directions.